IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | |
|---|---|
| SHALONDA LOCKE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 3:10-CV-132 |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

This is an action for judicial review, pursuant to 42 U.S.C. § 405(g), of defendant Commissioner's final decision denying plaintiff's claims for disability insurance and Supplemental Security Income ("SSI") benefits under Titles II and XVI of the Social Security Act. For the reasons provided herein, defendant's motion for summary judgment [doc. 24] will be granted, and plaintiff's motion for summary judgment [doc. 17] will be denied.

I.

*Procedural History*

Plaintiff was born in 1986. She applied for benefits in April 2005, alleging disability beginning in 2004. [Tr. 13-14, 516].[1] Plaintiff claims to be disabled by back pain,

---

[1] Plaintiff also filed applications in March 2008, alleging disability as of January 19, 2008. [Tr. 88].

carpal tunnel syndrome, bipolar disorder, anxiety, and schizophrenia. [Tr. 124, 721]. Her applications were denied initially and on reconsideration. Plaintiff then requested a hearing, which took place before an Administrative Law Judge ("ALJ") in November 2007.

In January 2008, the ALJ issued a decision denying benefits. [Tr. 513-23]. Plaintiff then sought, and was granted, review from the Commissioner's Appeals Council. Plaintiff's claim was remanded instructing, in material part, that the ALJ "[o]btain additional evidence concerning the claimant's bipolar disorder, depressive disorder and carpal tunnel . . . ." [Tr. 551].

Plaintiff received another administrative hearing in January 2009. In August of that year, the ALJ again issued a decision denying benefits. She concluded that plaintiff suffers from "schizoaffective disorder; bipolar disorder; gender identity disorder; depression and anxiety; [and] carpal tunnel syndrome," which are "severe" impairments but not equal, individually or in concert, to any impairment listed by the Commissioner. [Tr. 16]. The ALJ found plaintiff to have a residual functional capacity ("RFC") at the medium level of exertion restricted only by various "limited but satisfactory or mild" mental limitations. [Tr. 17]. The ALJ found plaintiff's subjective allegations to be inconsistent and overstated. [Tr. 23-24]. Relying on vocational expert ("VE") testimony, the ALJ determined that plaintiff remains able to perform a significant number of jobs existing in the state and national economies. [Tr. 25-26]. The ALJ thus concluded that plaintiff is not disabled.

2

Plaintiff then again sought, but was denied, review by the Commissioner's Appeals Council. [Tr. 1]. The ALJ's ruling therefore became the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481. Through her timely complaint, plaintiff has properly brought her case before this court for review. *See* 42 U.S.C. § 405(g).

II.

*Relevant Background*

A. Personal

Plaintiff is a gang member [Tr. 289] who complains that her "brain cells are gone." [Tr. 140]. She allegedly spends her days doing nothing but watching television, listening to music, "playing," and talking to her imaginary friend "Tasha." [Tr. 102, 131, 775]. Plaintiff claims that "so many people live in me" [Tr. 101] and that those entities "tell me wheather [sic] my day gone [sic] be good or bad. They control me." [Tr. 102]. Due to carpal tunnel syndrome, plaintiff also claims that her "hands are very bad. I can't do anything . . . ." [Tr. 44].

Although she purports to be "a young handycap [sic] person with a dumb mind" [Tr. 101], plaintiff has a high school diploma [Tr. 37] and *did not* attend special education classes. [Tr. 1057]. Her past employment includes working full-time for two years as a cashier in a fast-food restaurant. [Tr. 38, 111]. She admittedly remains capable of babysitting relatives and taking children to the park. [Tr. 775].

In April 2008, plaintiff told a social worker "that when she was taking her medication 'they stopped me from being paranoid and hearing voices, and seeing things,'" although three months later she denied that the medication was fully effective. [Tr. 443, 463]. Plaintiff has multiple tattoos [Tr. 331, 767] and consumes up to 24 sodas and two gallons of tea per day [Tr. 362]. However, she claims to be unable to afford her necessary medicine. [Tr. 1055].

To fill that void, plaintiff "occasionally" smokes marijuana. [Tr. 766, 1056, 1180]. She explains, "I don't have no medication. So I will smoke some marijuana. . . . I will smoke some marijuana because it calms me down. . . . [I]t helps me because I don't have no medications." [Tr. 45-46]. As noted by the ALJ, an interviewing clinical psychologist and an interviewing psychological examiner have both opined that, if benefits were awarded, a protective payee should be named due to plaintiff's history of substance abuse. [Tr. 22, 776, 1064]. These professional opinions notwithstanding, plaintiff has criticized the "bitches" within the Social Security determination process who "say I abuse weed." [Tr. 109].[2]

---

[2] In a Function Report questionnaire submitted to the Commissioner, plaintiff went on to illuminate the perceived benefits of her marijuana consumption: "I HAVE TO SMOKE THAT KEEP ME COO. Damn that's it. When I smoke I think about everything and I think y'all shud really help me. This aint got s*** to do with money. Wat the f***. Just f***** help me. That's it." [Tr. 109] (emphasis and spelling in original).

Case 3:10-cv-00132-RLJ-CCS   Document 26   Filed 06/20/11   Page 4 of 16   PageID #: 102

B. <u>Medical</u>[3]

June 13, 2007 nerve conduction studies were "consistent with, but not specifically diagnostic of, the presence of bilateral carpal tunnel syndrome." [Tr. 395]. The condition was deemed "mild to moderate" on the right and "very mild" on the left. [Tr. 395-96].

Dr. Srinivasa Chintalapudi's office gave plaintiff a wrist splint to help improve her carpal tunnel symptoms. On June 27, 2007, plaintiff told Dr. Chintalapudi that she had not been wearing the splint. [Tr. 378]. On July 25, 2007, she told Dr. Chintalapudi that she had lost the splint. [Tr. 377]. Having not complied with recommended treatment, plaintiff on both occasions continued to complain of worsening wrist pain. [Tr. 377-78].[4]

Dr. Eva Misra performed a physical consultative examination in October 2008. Grip strength was reduced bilaterally, with a positive sign for carpal tunnel on the right. [Tr. 767]. Dr. Misra opined that plaintiff would be limited to occasional manipulative use of the right hand and occasional-to-frequent manipulation on the left. [Tr. 762].

Dr. Louise Patikas completed a Physical RFC Assessment in July 2008. In material part, Dr. Patikas opined that plaintiff would be limited to no more than frequent bilateral handling. [Tr. 419].

---

[3] Because plaintiff's briefing to this court focuses only on her alleged carpal tunnel and mental limitations, the court's factual recitation will do likewise.

[4] At one of her administrative hearings, plaintiff also acknowledged that a doctor had "prescribed me some steroid things" to address her carpal tunnel complaints, but plaintiff did not take the medication. [Tr. 1175-76].

5

Senior psychological examiner Alice Garland performed a mental status examination in August 2007. Plaintiff was

> superficially cooperative, but may have been trying to exaggerate symptoms. For instance, she said that she has an imaginary friend, Tosha [sic], who was at the evaluation with her, sitting in the other chair and she several times made comments to Tosha. She also did not appear to be putting forth good effort in testing, which is not felt to be a reliable estimation of this claimant's ability.

[Tr. 1056].[5]

WAIS-III test scores were in the mild mental retardation range, which Ms. Garland noted to be inconsistent with plaintiff's demonstrated ability to attain a high school diploma without the need for special education classes. [Tr. 1059]. Plaintiff claimed to be unable to subtract one from five or add seven plus two. [Tr. 1060]. Ms. Garland deemed it noteworthy that all of plaintiff's mathematical responses were one number off of the correct answer. [Tr. 1060]. Supplemental testing was "not given due to the claimant's poor investment in test taking." [Tr. 1059]. Ms. Garland noted that plaintiff "did not seem that impaired intellectually." [Tr. 1058]. Ms. Garland was unable to offer any definitive vocational assessment due to apparent malingering. [Tr. 1060-63].

Frances Breslin, Ph.D. completed a Mental RFC Assessment in July 2008. Dr. Breslin agreed that plaintiff's conduct during Ms. Garland's examination, and her reports of an imaginary friend, were not credible. [Tr. 414]. Dr. Breslin further agreed that plaintiff's recent test results were indicative of malingering. [Tr. 414]. Nonetheless, in boxes checked

---

[5] At one point in the examination, Tasha purportedly criticized plaintiff for "tell[ing] people her business." [Tr. 1057].

in the "Summary Conclusions" portion of her RFC Assessment form, Dr. Breslin indicated various "moderate" vocational limitations. [Tr. 424-25]. Dr. Breslin then elaborated on those summary conclusions as follows:

> The claimant can understand, remember, and follow simple 1-2 step instructions. The claimant can attend to tasks for at least 2 hours and work an 8-hour day utilizing all customary breaks and rest periods. Contact with peers should be casual and informal. Maintenance of an acceptable work schedule is not precluded by the claimant's psychiatric condition.
>
> There should be no intensive interaction with the public and minimal contact with peers. The claimant can accept direct and[] non-confrontational correction. The claimant can adapt to change introduced in a gradual, low stress manner.

[Tr. 426].

In October 2008, clinical psychologist Jodie Castellani performed a mental status examination. Regarding marijuana consumption,

> The claimant initially denied any history of substance abuse but later reported that she quit marijuana one month ago. She explained that she smokes marijuana only when she is out of medication. She advised her prior DDS evaluator that she smokes marijuana when she is "down and out."

[Tr. 772]. Consistent with her reports to the Commissioner and various social workers, plaintiff told Dr. Castellani that she experiences visual and auditory hallucinations "all the time." Dr. Castellani deemed this claim "inconsistent with her demeanor in the interview today as well as records from Lakeshore Mental Health Institute in which psychosis was not endorsed." [Tr. 774].[6]

---

[6] The referenced records of Lakeshore Mental Health Institute pertain to a purported April
(continued...)

7

Dr. Castellani noted "some concern about the veracity of her psychotic symptoms" and "simultaneous concerns about some degree of malingering in this case," suggesting that further testing "may be useful to rule out the possibility of an exaggerated presentation." [Tr. 776-77]. Upon completion of the interview, Dr. Castellani predicted that plaintiff would be mildly limited in understanding and remembering complex tasks, and that she would be moderately limited in adaptation, social interaction, and sustaining concentration and persistence. [Tr. 775-76]. Dr. Castellani also completed a pre-printed vocational assessment form, checking various mild and moderate categories of limitation. [Tr. 778-79]. The form utilized by Dr. Castellani defines "moderate" as "more than a slight limitation in this area but the individual is still able to function satisfactorily." [Tr. 778].

Frank Kupstas, Ph.D. completed a Mental RFC Assessment form in October 2008. Like Dr. Breslin, Dr. Kupstas deemed plaintiff's subjective complaints only partially credible. [Tr. 487]. Boxes checked in Dr. Kupstas's "Summary Conclusions" indicated certain "moderate" vocational limitations. [Tr. 489-90]. Like Dr. Breslin, Dr. Kupstas then elaborated on his summary conclusions:

---

[6](...continued)
2005 suicide attempt in which plaintiff allegedly took 18-20 tablets of antipsychotic medication "because she did not have a nice place to live." [Tr. 826]. Plaintiff was "unable" to tell the attending physician where she had gotten the pills. [Tr. 826]. Despite her claims of worsening anger and impulsivity, plaintiff was described as "interact[ing] well with staff and peers and us[ing] her privileges appropriately." [Tr. 829]. Among the discharge instructions was an admonition to not "take any medications that were not prescribed for you." [Tr. 830].

> Able to remember simple instructions, detailed [with] some difficulty at times.
>
> Able to sustain [concentration, persistence, and pace] over extended periods for simple tasks, detailed [with] some difficulty at times.
>
> Able to interact [with] general public [with] some difficulty at times.
>
> Able to respond to routine changes.

[Tr. 491].

### III.

### *Applicable Legal Standards*

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's decision. 42 U.S.C. § 405(g); *Richardson v. Sec'y of Health & Human Servs.*, 735 F.2d 962, 963 (6th Cir. 1984). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The "substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Beavers v. Sec'y of Health, Educ. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488 (1951)). In reviewing administrative decisions, the court must take care not to "abdicate [its] conventional judicial function," despite the narrow scope of review. *Universal Camera*, 340 U.S. at 490.

A claimant is entitled to disability insurance payments if she (1) is insured for disability insurance benefits, (2) has not attained retirement age, (3) has filed an application

9

for disability insurance benefits, and (4) is under a disability. 42 U.S.C. § 423(a)(1). "Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).[7] Disability is evaluated pursuant to a five-step analysis summarized as follows:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

---

[7] A claimant is eligible for SSI benefits on the basis of financial need and either age, blindness, or disability. 42 U.S.C. § 1382. "Disability," for SSI purposes, is defined the same as under § 423. 42 U.S.C. § 1382c(a)(3).

5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) (citing 20 C.F.R. § 404.1520). Plaintiffs bear the burden of proof during the first four steps. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five. *See id*.

IV.

*Analysis*

Plaintiff complains that the ALJ's RFC finding for the full range of medium work was inconsistent with the opinions of Drs. Misra and Patikas. Plaintiff also contends that the ALJ erred in finding a mental RFC inconsistent with the opinions of Drs. Breslin and Kupstas. Further, she makes reference to her myriad subjective complaints and to various Global Assessment of Functioning ("GAF") scores found in the record. The court will address these issues in turn.

A. Carpal Tunnel

The ALJ noted Dr. Patikas's opinion that plaintiff would be limited to no more than frequent bilateral handling, and the ALJ purportedly "accepted" Dr. Misra's opinions which would include a restriction to occasional use of the right wrist. [Tr. 20-21, 23-24]. Nonetheless, the ALJ found plaintiff physically capable of performing the full range of medium work with no carpal tunnel-associated restrictions.

11

As noted above, plaintiff refuses to responsibly participate in her own health care. She would not wear her wrist splint which she eventually lost, and she refused to take the "steroid things" prescribed for her. That conduct is utterly inconsistent with what would be expected of a person who truly suffers from the degree of carpal tunnel limitation alleged. *See, e.g., Sias v. Sec'y of Health & Human Servs.*, 861 F.2d 475, 480 (6th Cir. 1988).

Nonetheless, the objective record does contain some evidence of carpal tunnel syndrome, which Drs. Misra and Patikas predicted would cause workplace limitation. The ALJ did not explain his rejection of those sources' opinions, and plaintiff is correct that this was error. However, the error is deemed harmless on the facts of the present case.

In response to the ALJ's vocational hypotheticals, the VE identified a number of corresponding jobs existing in the state and national economies. Among the listed jobs was ushering, with approximately 1,900 positions in the state economy and 117,400 nationwide. [Tr. 57]. The VE testified that ushering can be performed by a worker limited to no more than occasional handling. [Tr. 57-58]. *See, e.g., Hall v. Bowen*, 837 F.2d 272, 274-75 (6th Cir. 1988) (1,350 jobs existing in the region was a significant number); *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 578-79 (6th Cir. 2009) (total of 2,000 jobs was significant); *Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 375 (6th Cir. 2006) (870 jobs in the region could constitute a significant number).

In determining whether a quantity of existing jobs is "significant," courts should consider a number of factors including:

12

>the level of claimant's disability; the reliability of the vocational expert's testimony; the reliability of the claimant's testimony; the distance claimant is capable of travelling to engage in the assigned work; the isolated nature of the jobs; the types and availability of such work, and so on. The decision should ultimately be left to the trial judge's common sense in weighing the statutory language as applied to a particular claimant's factual situation.

*Hall*, 837 F.2d at 275.

Applying these factors to the present claimant, the court deems most relevant the level of plaintiff's limitation viewed in light of the reliability of her subjective claims. As noted above, plaintiff's repeated failure to participate in prescribed carpal tunnel treatments strongly suggests that her discomfort is not as bad as she alleges. As will be discussed in more detail below, other discrepancies in the record leave this court skeptical of all of plaintiff's complaints. The court therefore concludes that the ushering numbers identified by the ALJ constitute a significant number of jobs available to accommodate the limitation opined by Drs. Misra and Patikas. Any error in the ALJ's failure to address those two physicians' opinions is accordingly deemed harmless.

### B. GAF Scores and Subjective Allegations

Plaintiff's briefing to this court relies heavily on her subjective allegations and various low GAF scores assigned by social workers and others. The ALJ credited plaintiff's subjective complaints to some degree by restricting her to a range of medium work. Ultimately, however, the ALJ deemed plaintiff's representations to be unreliable and overstated. That conclusion was abundantly supported by substantial evidence. From the nearly 1,200 pages of administrative record now before the court, the following

13

nonexhaustive sampling is noted:

> 1. Plaintiff purports to be unable to execute elementary addition and subtraction, yet she was able to graduate high school and work full-time for two years as a cashier.
>
> 2. Plaintiff claims to be virtually homebound and physically unable to work, yet she is able to maintain membership in a gang.
>
> 3. Plaintiff claims to be unable to afford admittedly beneficial medication, yet she has sufficient resources to consume up to 24 sodas and two gallons of tea per day, and multiple tattoos.
>
> 4. Ms. Garland and Drs. Castellani and Breslin each suspected that plaintiff is malingering.

To the extent that plaintiff now argues that various GAF scores are probative of her true condition, those scores are based on her unreliable self-reporting and are of no value. *See generally DeBoard v. Comm'r of Soc. Sec.*, No. 05-6854, 2006 WL 3690637, at *3-4 (6th Cir. Dec. 15, 2006); *see also White v. Comm'r of Soc.* Sec., 572 F.3d 272, 276 (6th Cir. 2009) (citation and quotation omitted) (GAF score is a "subjective determination"); *Oliver v. Comm'r of Soc. Sec.*, No. 09-2543, 2011 WL 924688, at *4 (6th Cir. Mar. 17, 2011) (a GAF score is generally "not particularly helpful by itself" and is "not dispositive of anything in and of itself").

Case 3:10-cv-00132-RLJ-CCS   Document 26   Filed 06/20/11   Page 14 of 16   PageID #: 112

## C. Psychological Limitations

The ALJ found plaintiff capable of performing medium work restricted by

> a limited but satisfactory or mild problem with relating with co-workers, interacting with supervisors, dealing with the public, using judgment, dealing with work stress, maintaining attention and concentration[,] understanding[,] remembering and carrying out complex instructions, behaving in an emotionally stable manner, responding appropriately to changes in the work setting[,] working close to others without undue distraction and completing a normal workweek.

[Tr. 17]. Relying particularly on the opinion forms completed by nonexamining Drs. Breslin and Kupstas, plaintiff argues that her limitations are in fact much more severe.

The ALJ's conclusions were supported by substantial evidence. The above-listed limitations were consistent with (if not slightly more encompassing than) the predictions found in Dr. Castellani's opinion form. While Dr. Castellani checked several boxes indicating "moderate" restriction, her form's definition of the term "moderate" is consistent with the "limited but satisfactory" language employed by the ALJ.

Dr. Castellani is a clinical psychologist who personally examined plaintiff. Drs. Breslin and Kupstas did not examine plaintiff. They merely reviewed the file. It is not error to assign greater weight to the opinion of an examining source. *See* 20 C.F.R. § 416.927(d)(1). Moreover, the elaborated explanations of their conclusions provided by Drs. Breslin and Kupstas are not inconsistent with the limitations imposed by the ALJ. [Tr. 426, 491]. In sum, there was no error.

15

## D. Conclusion

In light of the administrative record now before the court, it appears that the ALJ generously gave plaintiff the benefit of the doubt in restricting her to a range of medium work. The court finds no ground for reversal or remand in the issues presented on appeal. The Commissioner's final decision will be affirmed, and an order consistent with this opinion will be entered.

ENTER:

<u>     s/ Leon Jordan     </u>
United States District Judge